# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x
:
PATRICK BROWN and COLLIN VINCENT,                    :
:
              Plaintiffs,                    :
:
          -against-                    :
:    No. 1:25 Civ. 01220 (PAE)
NATIONAL FOOTBALL LEAGUE, INC. and NFL                    :
ENTERPRISES LLC,                    :    Oral Argument Requested
:
            Defendants.                    :
:
:
:
------------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE AMENDED COMPLAINT FOR INJUNCTIVE RELIEF

DEBEVOISE & PLIMPTON LLP

Michael Schaper (*mschaper@debevoise.com*)
John Gleeson (*jgleeson@debevoise.com*)
J. Robert Abraham (*jrabraham@debevoise.com*)
66 Hudson Boulevard
New York, New York 10001
Tel: (212) 909-6000

Edward D. Hassi (*thassi@debevoise.com*)
801 Pennsylvania Avenue N.W.
Washington, D.C. 20004
Tel: (202) 383-8000

*Attorneys for Defendants National Football League
and NFL Enterprises LLC*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 4

I.      THE NATIONAL FOOTBALL LEAGUE. ......................................................... 4

II.     THE NFL'S ONLINE AND SOCIAL MEDIA PRESENCE. ............................ 4

III.    WIDESPREAD AVAILABILITY OF NFL NEWS AND CONTENT. ............ 5

IV.     BLUESKY .............................................................................................................. 6

V.      PLAINTIFFS' CLAIMS. ....................................................................................... 7

ARGUMENT ........................................................................................................................ 8

I.      PLAINTIFFS DO NOT HAVE ARTICLE III STANDING. .............................. 9

        A.      Plaintiffs Have Not Suffered Any Concrete or Particularized Injury. .................. 9

        B.      Plaintiffs' Purported Injury Is Not Fairly Traceable to Defendants'
                Alleged Conduct nor Redressable by This Court. ................................. 12

II.     PLAINTIFFS HAVE NOT ALLEGED ANTITRUST STANDING. ............... 13

        A.      Plaintiffs Have Not Suffered Any "Antitrust Injury." ........................... 14

        B.      Plaintiffs Are Not Efficient Enforcers of the Purported Claims. ........................ 15

III.    PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED A SHERMAN ACT
        VIOLATION. ......................................................................................................... 16

        A.      Plaintiffs Have Not Plausibly Alleged a *Per Se* Violation. .................... 17

        B.      Plaintiffs Have Not Plausibly Alleged a Violation Under the Rule of
                Reason. ......................................................................................................... 19

                1.      Plaintiffs Have Not Plausibly Alleged a Relevant Antitrust Market. ....... 20

                2.      Plaintiffs Have Not Plausibly Alleged Harm to Competition. ................. 22

                3.      The NFL's Policy Is Pro-Competitive and Promotes Broad
                        Distribution of Content to NFL Fans. ..................................... 23

IV.     THE AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE. ..... 25

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*1-800 Contacts, Inc. v. Fed. Trade Comm'n,*
  1 F.4th 102 (2d Cir. 2021) ................................................................................24

*American Needle, Inc. v. Nat'l Football League,*
  560 U.S. 183 (2010) ................................................................................ *passim*

*Amigo Shuttle Inc. v. Port Auth. of N.Y. & N.J.*
  No. 22-CV-10361 (PKC), 2024 WL 4628330 (S.D.N.Y. Mar. 26, 2024)..............................15

*An v. Shan,*
  No. 22-CV-10060 (ALC), 2023 WL 6215003 (S.D.N.Y. Sept. 25, 2023)...........................10

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
  459 U.S. 519 (1983) ................................................................................13, 23

*Balaklaw v. Lovell,*
  14 F.3d 793 (2d Cir. 1994)................................................................................14

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)................................................................................8

*Bilinski v. Keith Haring Found., Inc.,*
  96 F. Supp. 3d 35 (S.D.N.Y.), *aff'd in part*, 632 F. App'x 637 (2d Cir. 2015).....................19

*Bogan v. Hodgkins,*
  166 F.3d 509 (2d Cir. 1999)................................................................................17

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,*
  429 U.S. 477 (1977)................................................................................14

*Cargill v. Monfort,*
  479 U.S. 104 (1986)................................................................................13, 14

*Cavazzini v. MRS Assocs.,*
  574 F. Supp. 3d 134 (E.D.N.Y. 2021) ................................................................................11

*Cenedella v. Metro. Museum of Art,*
  348 F. Supp. 3d 346 (S.D.N.Y. 2018)................................................................................22

*Chalmers v. NCAA,*
  24-Civ-5008 (PAE), 2025 WL 1225168 (S.D.N.Y. Apr. 28, 2025)........................................25

*Chapman v. N.Y. State Div. for Youth,*
  546 F.3d 230 (2d Cir. 2008)................................................................................20, 21

*Choh v. Brown Univ.*,
  753 F. Supp. 3d 117 (D. Conn. 2024) ...............................................................................18, 22

*Consortium for Indep. Journalism, Inc. v. United States.*,
  No. 23-CIV-7088 (KPF), 2025 WL 919504 (S.D.N.Y. Mar. 26, 2025) ..................................13

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
  433 U.S. 36 (1977) .................................................................................................................17

*D.H. v. City of New York*,
  309 F. Supp. 3d 52 (S.D.N.Y. 2018) .....................................................................................12

*Daniel v. Am. Bd. of Emergency Med.*,
  428 F.3d 408 (2d Cir. 2005) .................................................................................................14

*De Medicis v. Ally Bank*,
  No. 21 CIV. 6799 (NSR), 2022 WL 3043669 (S.D.N.Y. Aug. 2, 2022) ................................12

*DIRECTV, LLC v. Nextstar Media Grp., Inc.*,
  724 F. Supp. 3d 268 (S.D.N.Y. 2024) ..............................................................................15, 16

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
  323 F. Supp. 3d 393 (S.D.N.Y. 2018) .....................................................................................21

*Frisone v. Pepsico, Inc.*,
  369 F. Supp. 2d 464 (S.D.N.Y. 2005) ......................................................................................8

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
  711 F.3d 68 (2d Cir. 2013) .............................................................................................14, 15

*Gong v. Sarnoff*,
  No. 23-CV-00343 (LJL), 2023 WL 4561800 (S.D.N.Y. July 17, 2023) ................................10

*Guthrie v. Rainbow Fencing Inc.*,
  113 F.4th 300 (2d Cir. 2024) .................................................................................................10

*Harty v. W. Point Realty, Inc.*,
  28 F.4th 435 (2d Cir. 2022) ...................................................................................................10

*In re Aluminum Warehousing Antitrust Litig.*,
  No. 21-643, 2023 WL 7180648 (2d Cir. Nov. 1, 2023) ........................................................16

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
  433 F. Supp. 3d 395 (E.D.N.Y. 2020) ...................................................................................16

*In re Inclusive Access Course Materials Antitrust Litig.*,
  544 F. Supp. 3d 420 (S.D.N.Y. 2021) ....................................................................................22

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019) ..............................................................14, 16

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
    924 F.3d 57 (2d Cir. 2019) .......................................................................................16

*Kleinman v. Elan Corp., PLC*,
    706 F.3d 145 (2d Cir. 2013) ......................................................................................9

*Kola v. Forster & Garbus LLP*,
    No. 19-CV-10496 (CS), 2021 WL 4135153 (S.D.N.Y. Sept. 10, 2021) ...................9

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
    726 F.2d 1381 (9th Cir. 1984) .................................................................................18

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...................................................................................................9

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
    420 F. Supp. 2d 212 (S.D.N.Y. 2005), aff'd, 542 F.3d 290 (2d Cir. 2008) ............24

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000) ......................................................................................8

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ......................................................................................11, 13, 24

*N. Pac. Ry. Co. v. United States*,
    356 U.S. 1 (1958) .....................................................................................................17

*N.W. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
    472 U.S. 284 (1985) .................................................................................................19

*Nat'l Res. Def. Council v. Bodine*,
    471 F. Supp. 3d 524 (S.D.N.Y. 2020) ......................................................................10

*Ng v. Sedgwick Glob. Inc.*,
    No. 1:23-CV-10380 (MKV), 2025 WL 579972 (S.D.N.Y. Feb. 21, 2025) ............25

*North American Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018) ................................................................................17, 25

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*,
    No. CIVA 03 CV 6150 DGT, 2005 WL 711658 (E.D.N.Y. Mar. 29, 2005) ...........16

*Pension Ben. Guar. Corp. v. Morgan Stanley Inv't Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013) ......................................................................................8

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*,
    530 F. Supp. 3d 301 (S.D.N.Y. 2021)...................................................................20

*Planetarium Travel, Inc. v. Altour Int'l, Inc.*,
    97 F. Supp. 3d 424 (S.D.N.Y.), *aff'd*, 622 F. App'x 40 (2d Cir. 2015) ................................23

*Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*,
    412 F. Supp. 3d 941 (N.D. Ill. 2019) ....................................................................25

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007).................................................................................9

*Shak v. JPMorgan Chase & Co.*,
    156 F. Supp. 3d 462 (S.D.N.Y. 2016)..................................................................22

*Spinelli v. Nat'l Football League*,
    96 F. Supp. 3d 81 (S.D.N.Y. 2015) .........................................................4, 14, 24

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016).......................................................................................9, 12

*Summerville v. Gotham Comedy Found., Inc.*,
    No. 24-CV-01484 (ER), 2025 WL 588644 (S.D.N.Y. Feb. 24, 2025)....................8

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001).........................................................................20, 22

*Topps Chewing Gum, Inc. v. Major League Baseball Players Ass'n*,
    641 F. Supp. 1179 (S.D.N.Y. 1986).....................................................................17

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021).............................................................................................9

*Tschoe v. Monarch Recovery Mgmt., Inc.*,
    No. 20 CIV. 7331 (PGG), 2024 WL 2814270 (S.D.N.Y. May 31, 2024)........10, 11

*United States ex rel. Ladas v. Exelis, Inc.*,
    824 F.3d 16 (2d Cir. 2016)..................................................................................25

*United States v. Am. Express Co.*,
    838 F.3d 179 (2d Cir. 2016)................................................................................19

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015)................................................................................17

*United States v. Nat'l Soc. of Pro. Eng'rs*,
    555 F.2d 978 (D.C. Cir. 1977), *aff'd*, 435 U.S. 679 (1978)..................................13

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..................................................................................................13

*Washington v. Nat'l Football League*,
    880 F.Supp.2d 1004 (D. Minn. 2012) ...............................................................4, 24

*Yankovich v. Applus Techs., Inc.*,
    621 F. Supp. 3d 269 (D. Conn. 2022) ......................................................................12

**Statutes**

Sherman Act, 15 U.S.C. § 1 ................................................................................ *passim*

**Rules**

Fed. R. Civ. P. 12(b)(1)..........................................................................................1, 8

Fed. R. Civ. P. 12(b)(6)..........................................................................................1, 8

Defendants the National Football League (incorrectly named as National Football League, Inc.) and NFL Enterprises LLC (together, the "NFL") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint for Injunctive Relief (Dkt. No. 25) ("AC" or "Amended Complaint") filed by Plaintiffs Patrick Brown and Collin Vincent (together, "Plaintiffs") for lack of subject matter jurisdiction, Fed. R. Civ. P. 12(b)(1), and for failure to state a claim, Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

This lawsuit is a brazen attempt to use antitrust law to force the NFL and its teams to distribute widely available content to Plaintiffs via their preferred social media platform. Plaintiffs allege that the NFL is engaged in a group boycott of the nascent social media platform Bluesky in favor of X (formerly known as Twitter) that purportedly deprives NFL fans of access to NFL news and information in violation of the Sherman Antitrust Act. But Plaintiffs' claims are riddled with legal holes and belied by undeniable facts, including: (1) the NFL and its individual teams have an extensive official online and social media presence across many platforms that is by no means limited to X; (2) the NFL is extensively covered and discussed across many forms of media, including on Bluesky; and (3) Plaintiffs are not required to use X to access or discuss NFL news and information that is freely available on a wide variety of mediums and through many platforms. At its core, Plaintiffs' claim is that they should have the right to access the specific NFL news and highlights they want from a particular official NFL team account maintained on the social media platform of their choosing, no matter how new, small or untested that platform may be. But there is no general right to access information through a chosen medium and Plaintiffs cannot invoke the antitrust laws to require the NFL or individual NFL teams to make official NFL content available to them on Bluesky or any other

social media network of their choosing. The Amended Complaint should be dismissed with prejudice for multiple reasons.

***First***, Plaintiffs do not have standing under Article III and therefore cannot establish subject matter jurisdiction. Plaintiffs' claimed injury—an alleged inability to receive granular NFL news on official NFL and team accounts on their chosen social media network—is not a concrete and particularized injury in fact sufficient to meet Article III requirements; it is the type of boundless informational injury that courts have repeatedly rejected. Moreover, Plaintiffs' purported injury is neither fairly traceable to the alleged conduct of the NFL nor redressable by this Court. Even if this Court were to order the NFL to "allow" NFL teams to be on Bluesky, it could not require NFL teams—much less the specific teams Plaintiffs follow—to open official accounts on Bluesky or post on Bluesky the specific granular information of interest to Plaintiffs which (according to Plaintiffs) is not available on any of other myriad non-X platforms on which NFL teams have official accounts. In short, Plaintiffs have not suffered any concrete injury sufficient to confer standing and any relief this Court might grant is not likely to redress their claimed harm.

***Second***, Plaintiffs have not plausibly alleged antitrust standing, i.e., that they have suffered an "antitrust injury" and are the proper party to bring an antitrust claim. In particular, Plaintiffs do not plausibly allege they have suffered any economic injury of the type the antitrust laws were meant to prevent in the form of higher prices or reduced output. Indeed, the only possible economic injury alleged is a purported injury to Bluesky by its inability to "monetize" a relationship with the NFL. But to the extent any such claim exists (it does not), Plaintiffs are not an efficient enforcer of that claim or the proper party to bring such an action; only Bluesky is.

***Third***, Plaintiffs have not plausibly alleged a violation of the Sherman Act. Plaintiffs have not plausibly alleged a "group boycott" of Bluesky in favor of X; at most, they allege that Bluesky is not *yet* one of the NFL's many approved social media partners. Moreover, Plaintiffs' claims against the NFL must be assessed under the rule of reason, *see American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203 (2010), which requires Plaintiffs to plausibly allege a relevant antitrust market, anticompetitive effects in that market, and the lack of any pro-competitive justification for the challenged conduct. Plaintiffs' purported antitrust market— "NFL news in microblog form," AC ¶ 24—is facially implausible because it excludes the abundant NFL news sources across social media, the internet at large, and in other traditional media outlets (*e.g.*, television, radio, print). Nor have Plaintiffs plausibly alleged any economic harm owing to the NFL's alleged policies; NFL news updates are ubiquitous and freely available to fans, including Plaintiffs, as are social media platforms and other avenues through which fans can interact and discuss such news. Finally, as courts have recognized, there are pro-competitive justifications for the NFL's alleged policy of reviewing and approving social media platforms before authorizing distribution of official NFL content on those platforms, including promotion of the NFL's brand and reputation and ensuring NFL-owned intellectual property is protected and commercialized for the benefit of the NFL and its fanbase.

In short, Plaintiffs do not have standing—constitutional or as a matter of antitrust law—to pursue the purported claims alleged here and, even if they did, the Amended Complaint does not plausibly allege any antitrust law violation. Given Plaintiffs have already amended the Complaint once and because the fundamental flaws in their claims would render any further amendment futile, the Amended Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS[1]

### I.    THE NATIONAL FOOTBALL LEAGUE.

Defendant the National Football League is an unincorporated association of 32 member clubs.  AC ¶ 18.  Although each member club is separately owned and operated, *id.*, courts have recognized the need for the clubs to cooperate to produce NFL football and compete against other brands.  *See, e.g.*, *American Needle*, 560 U.S. at 202.  Accordingly, the league plays an essential role in creating and maintaining an environment in which the clubs can operate, including by developing and enforcing league rules governing play and conduct, facilitating an NFL draft, and organizing and officiating games among the individual NFL teams.  The NFL also plays a critical role in promoting and protecting the NFL brand and distributing NFL-owned content, including NFL game footage and highlights.  *See, e.g.*, *id.* at 198 (noting common interest in "promoting the NFL brand"); *Washington v. Nat'l Football League*, 880 F. Supp. 2d 1004, 1006 (D. Minn. 2012) (noting NFL "owns the game footage"); *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 114 (S.D.N.Y. 2015) (noting game photographs contain "intellectual property owned by the NFL").  Defendant NFL Enterprises LLC is a limited liability company and one of the NFL entities that licenses NFL-owned content to various entities, including social media platforms.  AC ¶ 19.  To promote the NFL's brand and protect its intellectual property, the NFL has a policy of reviewing and approving social media platforms before authorizing distribution of official NFL content on those platforms.  *Id.* ¶ 59.

### II.    THE NFL'S ONLINE AND SOCIAL MEDIA PRESENCE.

The NFL and its individual teams have an extensive online and social media presence.  Both the NFL and individual team platforms include extensive content relating to NFL, including

---

[1]    The factual allegations in the Amended Complaint are taken as true solely for purposes of this motion, except where those allegations contradict documents cited in or integral to the Amended Complaint or subject to judicial notice.  *Infra* at 7 n.10; Request For Judicial Notice filed herewith.

news feeds, injury updates, roster moves, in-game updates, and in-game video highlights. The NFL operates its own website, has its own mobile app, and maintains official accounts on a large number of online platforms, including: Facebook, Instagram, Threads, X (formerly known as Twitter), Pinterest, TikTok, Snapchat, and YouTube.[2]    Individual NFL teams likewise have extensive online and social media presences, including the teams Plaintiffs allege they wish to follow on Bluesky. For example, the Chicago Bears maintains its own team website, team mobile app, and official accounts on Facebook, Instagram, Threads, TikTok, Snapchat, YouTube, and X.[3]    The Seattle Seahawks similarly has a team website, team mobile app, and official accounts on Facebook, Instagram, Threads, TikTok, Snapchat, YouTube, X, LinkedIn, and Spotify, as well as an email newsletter distribution.[4]    Given the variety of online platforms utilized, neither the NFL nor its individual teams have an "exclusive" social media partnership with X or any other platform. Fans can access NFL news, updates, and content from official NFL and NFL team accounts on a plethora of social media platforms and other online portals.

## III.    WIDESPREAD AVAILABILITY OF NFL NEWS AND CONTENT.

NFL news and updates are not limited to "official" NFL or team social media accounts or online portals. The NFL is extensively covered and discussed on broadcast and cable television, online streaming services, AM/FM and satellite radio, podcasts, print media and on sports media

---

[2]    *See* http://www.nfl.com. The NFL's website includes news sections providing league-wide "News and Updates" as to injuries and transactions, as well as game updates and highlights. The website also links to official NFL accounts on various social media platforms. Ex. 1 (NFL Website Excerpts); *see* Ex. 22 (NFL Threads); Ex. 25 (NFL Pinterest). "Ex." refers to exhibits to the Declaration of J. Robert Abraham filed herewith.

[3]    *See* http://www.chicagobears.com. The Bears team website includes a news page with subsections covering, among other things, "Injury Updates" and "Roster Moves," as well as game video highlights. The website also links to official team accounts on various social media platforms under "Follow Us." Ex. 2 (Bears Website Excerpts); *see* Ex. 20 (Bears Threads); Ex. 18 (Bears Facebook).

[4]    *See* https://www.seahawks.com. The Seahawks team website includes news sections covering, among other things, "Injury Updates," "Roster Moves," and "Fantasy Insider," as well as game video highlights. The website also links to official team accounts on various social media platforms under the section "Follow The #Seahawks." Ex. 3 (Seahawks Website Excerpts); *see* Ex. 21 (Seahawks Threads); Ex. 19 (Seahawks Facebook).

websites and online platforms.  As just one example, ESPN provides extensive coverage of the NFL through broadcasts of certain contracted-for NFL games, play-by-play updates of NFL games, pre- and post-game shows, sports news broadcasts covering NFL news and updates and game highlights, websites dedicated to coverage of the NFL[5] and specific individual teams—including the Bears and the Seahawks[6]—and its own mobile app and social media channels which feature NFL news and updates.[7]  In addition to traditional media coverage of the NFL, there is extensive fan-generated content relating to the NFL available across social media platforms.[8]  In short, news, updates, and commentary relating to the NFL are ubiquitous.

## IV.    BLUESKY

Bluesky is a social media platform that first became open to public registration in 2024[9] and began to grow in the wake of Elon Musk's controversial management of X.  AC ¶¶ 3–4.  It is a new and still developing social media platform, and neither the NFL nor its individual teams currently maintain official accounts on Bluesky.  *See id.* ¶ 38.  As explained by Fred Kirsch, VP-Content of the New England Patriots:  "[The Patriots] had an account briefly on Bluesky but the league asked us to take it down because it's not an approved social media platform for the NFL *yet*."[10]  Even though there is no "official" NFL presence on Bluesky, NFL fans and other

---

[5]    *See* https://www.espn.com/nfl/; Ex. 4 (ESPN website excerpts).

[6]    *See* https://www.espn.com/nfl/team/_/name/chi/chicago-bears; Ex. 5 (ESPN Bears Website Excerpt) https://www.espn.com/nfl/team/_/name/sea/seattle-seahawks; Ex. 6 (ESPN Seahawks Website Excerpt).

[7]    The NFL is also extensively covered by FOX, CBS, NBC, the Sporting News, and many others.

[8]    *See, e.g.*, Facebook IQ (Feb. 5, 2018), *available at* www.facebook.com/iq/articles/super-bowl-2018-on-facebook (noting 62 million people had 270 million interactions on Facebook related to 2017 Super Bowl); Exs. 18–22 (select NFL and team social media account pages with millions of followers); Exs. 23,24 (Reddit-NFL) (noting Reddit is "[t]he place to discuss all NFL related things" and NFL is in top 1% of Reddit feeds with 12 million fans); AC ¶ 34 (alleging there were 806 *million* impressions and 89 *million* video views on X alone in connection with the NFL draft).

[9]    *See* Amanda Silberling, *Bluesky is now open for anyone to join*, TechCrunch (Feb. 6, 2024, 6:00 AM), available at https://techcrunch.com/2024/02/06/bluesky-is-now-open-for-anyone-to-join/.

[10]   *See* Ex. 7 (Boston.com Article).  Mr. Kirsch's comments are incorporated by reference in Paragraph 39 of the Complaint and can be considered on a motion to dismiss.

organizations post substantial content on Bluesky discussing the NFL, including breaking news, updates and commentary related to the Chicago Bears and Seattle Seahawks and other teams.[11]

## V.    PLAINTIFFS' CLAIMS.

Plaintiffs are NFL fans and Bluesky users who allege they would follow their preferred NFL teams—the Chicago Bears and Seattle Seahawks—on Bluesky "if they were allowed to be on Bluesky." AC ¶¶ 16–17. Plaintiffs allege that teams "could and would use [Bluesky] in exactly the same way they use X, to disseminate NFL news on microblogging platforms, particularly of the time-sensitive sort comprising pre-game and in-game highlights." *Id.* ¶ 39. Notwithstanding the NFL's extensive social media presence and the Amended Complaint's failure to allege that Bluesky has sought approval as a social media partner of the NFL, Plaintiffs allege the NFL has "refused to approve Bluesky" and thereby effected "a group boycott of Bluesky" in "favor of X" in violation of the Sherman Act, 15 U.S.C. § 1. AC ¶¶ 47, 59. Plaintiffs claim the NFL's alleged rule "forces Plaintiffs and other fans to either forgo an immediate outlet for news about their teams, or to use the X microblogging platform." *Id.* ¶ 67. Plaintiffs claim they have been injured because to "stay current with team news, gameday scoring, and injury reports," they "must sign up for X because [X] is the only place to get those types of immediate team-generated injury reports, trades, player status discussions and similar news content[.]" *Id.* ¶ 49. Plaintiffs further claim the NFL's policy "disadvantages Bluesky," does "not allow Bluesky to effectively compete," and deprives Bluesky of the opportunity to "monetize" a relationship with the NFL. *Id.* ¶¶ 47–48, 58. Plaintiffs seek a judgment displacing the NFL's freedom to determine whether a social media platform is an appropriate forum for

---

[11] *See, e.g.*, Ex. 8 (Bleacher Nation Bears, Bluesky) (https://bsky.app/profile/bn-bears.bsky.social) ("Obsessing about Caleb Williams and the rest of the Chicago Bears"); Ex. 9 (Adam Hoge, Bluesky) (https://bsky.app/profile/adamhoge.bsky.social) ("Bears insider/podcaster"); Ex. 10 (Brian Nemhauser, Bluesky) (https://bsky.app/profile/hawkblogger.com) ("Credentialed Journalist, Podcaster, covering the Seattle Seahawks for 18+ years").

official NFL content and requiring the NFL to allow individual teams to maintain official accounts on Bluesky. *Id.* at 15; ¶ 11.

## ARGUMENT

A court must dismiss a case under Rule 12(b)(1) where it "lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). The burden is on the party asserting subject matter jurisdiction to prove it exists by a preponderance of the evidence. *Id.* While courts generally take all facts alleged in the complaint as true, courts may "properly refer to evidence beyond the pleadings to resolve disputed jurisdictional facts. . . . Accordingly, the court may decide whether subject matter jurisdiction exists on the basis of affidavits or other evidence, and no presumptive truthfulness attaches to the complaint's jurisdictional allegations." *Frisone v. Pepsico, Inc.*, 369 F. Supp. 2d 464, 469–70 (S.D.N.Y. 2005) (quotations omitted).[12] Article III standing is a jurisdictional requirement. *See id.*

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Non-sensical allegations, as well as assertions that omit critical facts, do not have to be accepted as true on a motion to dismiss. *See Pension Ben. Guar. Corp. v. Morgan Stanley Inv't Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013) (quotations omitted) ("Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). On a motion to dismiss, courts may consider "statement[s] or documents incorporated into the complaint by

---

[12]    The Court should resolve the 12(b)(1) motion first because "disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of jurisdiction." *Summerville v. Gotham Comedy Found., Inc.*, No. 24-CV-01484 (ER), 2025 WL 588644, at *2 (S.D.N.Y. Feb. 24, 2025).

reference" and documents upon which the plaintiff "relied in bringing the suit." *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 152 (2d Cir. 2013). A court may also take judicial notice of publicly available documents "to determine what statements they contained." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (citation omitted); Request for Judicial Notice filed herewith.

## I.    PLAINTIFFS DO NOT HAVE ARTICLE III STANDING.

The Amended Complaint should be dismissed because Plaintiffs do not have standing under Article III of the U.S. Constitution. To establish Article III standing, Plaintiffs must show they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs do not meet any of these requirements.

### A.    Plaintiffs Have Not Suffered Any Concrete or Particularized Injury.

Article III requires an injury in fact that is "concrete and particularized." *Spokeo*, 578 U.S. at 338. Plaintiffs have not presented the type of "tangible" injury, such as monetary harm, that "readily qualify as concrete injuries under Article III." *Kola v. Forster & Garbus LLP*, No. 19-CV-10496 (CS), 2021 WL 4135153, at *4 (S.D.N.Y. Sept. 10, 2021) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 414 (2021)). Instead, Plaintiffs allege they are injured by having to forgo a "thing of value"—access to NFL news and information on one specific social media platform—or "pay with their attention through an outlet [X] they prefer not to [trade with] or refuse to trade with." AC ¶ 68. This supposed informational "injury" is not concrete, is belied by incontrovertible facts, and does not satisfy the "irreducible constitutional minimum" required for standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Plaintiffs do not allege that they are being forced to pay money to access NFL news or content. Instead, Plaintiffs' alleged injury is an inability to receive NFL team news and information directly from official NFL team accounts for free on their chosen social media

platform.  At most, this is an informational injury that is only sufficient to establish standing where a plaintiff (1) is entitled to the information under statute and (2) suffers the type of harm the legislature sought to prevent by requiring disclosure of that information.  *Nat'l Res. Def. Council v. Bodine*, 471 F. Supp. 3d 524, 535 (S.D.N.Y. 2020).  Even then, a plaintiff must prove a "concrete downstream injury-in-fact" resulting from the deprivation of information.  *Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300, 307 (2d Cir. 2024).  Plaintiffs' allegations fall well short.

Plaintiffs have no legal entitlement to free information about the NFL on their preferred social media platform and thus cannot possibly have suffered any harm a legislature sought to prevent.  *Gong v. Sarnoff*, No. 23-CV-00343 (LJL), 2023 WL 4561800, at *11 (S.D.N.Y. July 17, 2023) (quotations omitted) (no standing because "informational standing requires that a plaintiff be deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it and that he suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure."); *An v. Shan*, No. 22-CV-10060 (ALC), 2023 WL 6215003, at *4 (S.D.N.Y. Sept. 25, 2023) (same).

Nor have Plaintiffs alleged any concrete downstream consequence they have suffered. While the Amended Complaint makes vague reference to a potential disadvantage in fantasy sports[13] or loss of Plaintiffs' "attention," these are not sufficiently particularized harms to satisfy Article III. *See, e.g.*, *Guthrie*, 113 F.4th at 311 (dismissing claim for failure to plead concrete injury); *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 444 (2d Cir. 2022) (no Article III standing where no downstream consequence from alleged deprivation); *Tschoe v. Monarch Recovery Mgmt., Inc.*, No. 20 CIV. 7331 (PGG), 2024 WL 2814270, at *5 (S.D.N.Y. May 31, 2024)

---

[13]    Plaintiffs allege that fantasy sports leagues are "monetized" and that they may be "disadvantaged" by "missing . . . real-time updates if they choose not to engage with X," AC ¶ 57, and that Plaintiffs have been deprived of the "choice in where to pay their attention."  *Id.* ¶ 58.  Plaintiffs do not allege they have in fact been "disadvantaged" in any monetized fantasy sports league or even that they personally participate in such fantasy sports leagues.

(same); *see also Murthy v. Missouri*, 603 U.S. 43, 74–75 (2024) (rejecting plaintiffs' "right to listen" to others on social media theory as "startlingly broad" and insufficient to plead concrete injury); *Cavazzini v. MRS Assocs.*, 574 F. Supp. 3d 134, 143 (E.D.N.Y. 2021) (no standing based solely on the plaintiffs' "wasted time").

Plaintiffs' purported informational injury is not only far from concrete, it is belied by reality. The crux of Plaintiffs' claimed injury is that X is the *only* way they can access information that is "extremely time-sensitive, such as injury or personnel news immediately before or during games, and scores, highlights and on-field developments during games." AC ¶ 25; *see also id.* ¶ 52 (alleging Plaintiffs are "deprived of up-to-the minute granular information . . . unless they engage with one of the NFL's authorized or agreed upon social media outlets, the effect of which leaves plaintiffs with one option for this type of coverage: X"). This allegation is demonstrably false. Both the NFL and individual NFL teams—including Plaintiffs' preferred teams—maintain official accounts on numerous online platforms beyond X, including Threads (which Plaintiffs allege is a "microblog" platform like X and Bluesky), *id.* ¶ 53, Facebook, Instagram, Pinterest, TikTok, Snapchat, and YouTube, and the content and information available often overlaps and includes the type of information Plaintiffs claim to want. *Supra* at 5 n. 2, 3, and 4. For example, the Seahawks' and Bears' official X and Facebook pages both include (among other things) video and photo game highlights, promotion of upcoming games, game scoring updates, and injury updates.[14] And similar information is available on the NFL and individual teams' official websites, their mobile apps, a myriad of traditional media sources, and countless fan accounts and portals across social media and the broader internet, including on Bluesky itself. *Supra* at 7 n. 11. Simply put, there is no lack of "up-to-the minute granular

---

[14]    *Compare* Ex. 11 (Seahawks Facebook Posts Excerpt) *with* Ex. 12 (Seahawks X Posts Excerpt) and Ex. 13 (Bears Facebook Posts Excerpt) *with* Ex. 14 (Bears X Posts Excerpt) (including same or similar posts on both platforms on same day).

information" regarding the NFL; NFL news and content is ubiquitous. Plaintiffs are not deprived of such information nor are they "forced" to use X to access such information. This makes clear Plaintiffs have not—and cannot—plausibly allege any "concrete, particularized present injury in fact." *De Medicis v. Ally Bank*, No. 21 CIV. 6799 (NSR), 2022 WL 3043669, at *9 (S.D.N.Y. Aug. 2, 2022); *see also Yankovich v. Applus Techs., Inc.*, 621 F. Supp. 3d 269, 276 (D. Conn. 2022).

### B.   Plaintiffs' Purported Injury Is Not Fairly Traceable to Defendants' Alleged Conduct nor Redressable by This Court.

Plaintiffs also cannot show their alleged "injury" is "fairly traceable to the challenged conduct of the [NFL]" and "likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338. Plaintiffs repeatedly allege that NFL news posted on NFL teams' official accounts on non-X social media platforms—including Threads, an alleged microblogging platform—is insufficient to meet their needs. *See, e.g.*, *id.* ¶¶ 47, 55. The sufficiency of NFL news available on any given platform (in Plaintiffs' view) thus depends on the specific content individual teams choose to post and not whether the team has an official account on that platform (or whether the NFL has approved that particular platform). As such, Plaintiffs' claimed injury—deprivation of access to "granular" NFL news—is not traceable to the NFL's alleged boycott of Bluesky as opposed to Plaintiffs' apparent dissatisfaction with the granularity of content available on multiple non-X platforms and mediums. *See D.H. v. City of New York*, 309 F. Supp. 3d 52, 68 (S.D.N.Y. 2018) (no traceability where Plaintiff "has not plausibly alleged that her injury in fact could be traced to the conduct of any defendant. . .").

For similar reasons, it is implausible this Court could redress Plaintiffs' claimed injury. Even if the Court did require the NFL to "allow" teams to open Bluesky accounts, it could not

compel individual NFL teams to open official Bluesky accounts,[15] much less post the specific content Plaintiffs desire (which teams apparently have failed to do on other platforms, including Threads). It is a "bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not before the court" and should be "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Murthy*, 603 U.S. at 57 (quotations omitted). Plaintiffs have not plausibly alleged their requested relief is likely to redress their claimed injury. *See id.* at 71–73 (no redressability where injunction unlikely to affect online platforms' content moderation policies); *Consortium for Indep. Journalism, Inc. v. United States*, No. 23-CIV-7088 (KPF), 2025 WL 919504, at *10 (S.D.N.Y. Mar. 26, 2025) (no redressability where claimed injury would continue regardless of the defendant's actions).

## II.    PLAINTIFFS HAVE NOT ALLEGED ANTITRUST STANDING.

Even if Plaintiffs could establish Article III standing (they cannot), the Amended Complaint should be dismissed for failure to plead antitrust standing. *See, e.g.*, *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) (holding even if constitutional standing satisfied, courts "must make a further determination whether the plaintiff is a proper party to bring a private antitrust action"). To adequately plead antitrust standing, Plaintiffs must allege: (1) they have or will suffer an antitrust injury, *Cargill v. Monfort*, 479 U.S. 104, 122 (1986) (plaintiff seeking injunctive relief "must show threat of antitrust injury"); and (2) they are an "efficient enforcer" and "proper antitrust plaintiff." *In re*

---

[15]    As an example, the Bears and Seahawks do not maintain accounts on all the same social media platforms. *Supra* at 5 n. 3 and 4. Any request by Plaintiffs to compel participation would violate "the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Verizon Commc'ns Inc. v. L. Offs. of Curtis v. Trinko, LLP*, 540 U.S. 398, 408 (2004) (quotations omitted). Likewise, to compel speech on Bluesky would run afoul of the First Amendment. *United States v. Nat'l Soc. of Pro. Eng'rs*, 555 F.2d 978, 984 (D.C. Cir. 1977), *aff'd*, 435 U.S. 679, (1978).

*Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 220 (S.D.N.Y. 2019) (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005)). Plaintiffs have not plausibly alleged either.

### A.    Plaintiffs Have Not Suffered Any "Antitrust Injury."

"Antitrust injury" is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994).  It must "reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick*, 429 U.S. at 489.  In practice, "a plaintiff must allege that its loss comes from acts that reduce output or raise prices to consumers." *Spinelli*, 96 F. Supp. 3d at 108 (quotation omitted).

Plaintiffs' claimed injury—the inability to receive news, updates, and game highlights directly from their favorite NFL teams' official accounts on their preferred social media platform—bears no resemblance to the type of economic injury "the antitrust laws were intended to prevent." *Balaklaw*, 14 F.3d at 797 (quotations omitted).  Plaintiffs do not plausibly allege that they have or will be forced to pay higher prices for NFL-related content or that the output of such content is reduced by the NFL's alleged conduct.  In fact, Plaintiffs have not claimed they pay anything for such NFL-related news and content beyond their own "attention," AC ¶ 58, nor could they.  Free NFL content is ubiquitous across many free-to-use online platforms and other communication mediums. *Supra* at 4–7.  Nor is there any right—much less one arising out of antitrust law—to receive granular information on a preferred platform for free. *See Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 77 (2d Cir. 2013) (no antitrust injury where the plaintiff "ha[d] not been forced to pay higher prices for a product, as customers who are victimized by price-fixing schemes might" and instead claimed "injuries flow[ing] from its

participation and then exclusion from a distribution network that, allegedly, featured intra-brand price-fixing, and in which it had no right *ab initio* to participate").

To the extent Plaintiffs attempt to allege a purported injury to Bluesky, which Plaintiffs allege could potentially "monetize" NFL news by "advertising and selling data" if NFL teams maintained official accounts, that purported injury is not one suffered *by Plaintiffs*. Any purported injury to Bluesky cannot be a basis for Plaintiffs' antitrust injury. *See, e.g.*, *Amigo Shuttle Inc. v. Port Auth. of New York & New Jersey*, No. 22-CV-10361 (PKC), 2024 WL 4628330, at \*8 (S.D.N.Y. Mar. 26, 2024) (no antitrust standing where Plaintiff relied on "fines levied" by non-party against non-party competitors). Plaintiffs have not alleged any antitrust injury *they* suffer because of the NFL's alleged conduct.

### B.    Plaintiffs Are Not Efficient Enforcers of the Purported Claims.

Nor are Plaintiffs efficient enforcers or proper parties to bring antitrust claims. To assess whether a plaintiff is an efficient antitrust enforcer, courts consider:

> (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them . . . so as to avoid duplicative recoveries.

*Gatt*, 711 F.3d at 78 (citation omitted). These factors clearly indicate Plaintiffs are not an efficient enforcer here.

As discussed *supra* at 9–13, Plaintiffs' claimed injuries are entirely speculative and insufficient to establish Article III injury in fact, much less any antitrust injury suffered by Plaintiffs. And to the extent Plaintiffs have plausibly alleged any antitrust injury at all, it is paradigmatically indirect. Plaintiffs are consumers of NFL news but do not allege they pay to use Bluesky or any other platform. *DIRECTV LLC v. Nextstar Media Grp., Inc.*, 724 F. Supp. 3d

268, 279 (S.D.N.Y. 2024) ("[N]on-purchasers are typically inefficient enforcers of the antitrust laws."). Instead, Plaintiffs theorize that by using Bluesky, they provide their "attention," which Bluesky may in turn "monetize" to its benefit. AC ¶ 58. As such, any theoretical antitrust injury tied to the NFL's alleged boycott of Bluesky (there is none) would be suffered by Bluesky—by its purported inability to monetize Plaintiffs' "attention"—rather than by Plaintiffs. *See In re Keurig*, 383 F. Supp. 3d at 223 (no antitrust standing where the plaintiff "[did] not allege that Keurig directly overcharged them, but rather that one or more intermediaries passed on overcharges"); *In re Aluminum Warehousing Antitrust Litig.*, No. 21-643, 2023 WL 7180648, at *2 (2d Cir. Nov. 1, 2023) (affirming dismissal where claimed injury was "indirect").

To the extent there was a purported boycott of Bluesky (and there is not), then Bluesky itself—the supposed victim of the alleged boycott—is an obvious alternative and better suited enforcer of the antitrust laws and the proper party to seek the injunctive relief requested by Plaintiffs. *See IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 66 (2d Cir. 2019) (finding plaintiff was not an efficient enforcer where it was "further removed from the harm caused by the Defendants than the parties directly affected by the boycott"); *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 433 F. Supp. 3d 395, 411 (E.D.N.Y. 2020) (plaintiffs were not efficient enforcers where "the Government, other, larger, merchants, and [] consumers" were more efficient); *aff'd*, 19 F.4th 127 (2d Cir. 2021), *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, No. CIVA 03 CV 6150 DGT, 2005 WL 711658, at *4 (E.D.N.Y. Mar. 29, 2005) (holding plaintiff was a "remote party" and not an efficient enforcer).

## III.    PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED A SHERMAN ACT VIOLATION.

To state a claim under Section 1 of the Sherman Act, Plaintiffs must plausibly allege a "common scheme . . . constitut[ing] an unreasonable restraint of trade either per se or under the

rule of reason." *United States v. Apple, Inc.*, 791 F.3d 290, 320–21 (2d Cir. 2015) (quotations omitted). *Per se* rules of illegality are only appropriate where they relate to "manifestly anticompetitive" conduct; courts presumptively apply the rule of reason, which requires consideration of "all of the circumstances of a case" in deciding whether the challenged conduct violates Section 1. *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49–50 (1977). Here, Plaintiffs have not plausibly alleged a *per se* or rule of reason violation of the Sherman Act.

### A.    Plaintiffs Have Not Plausibly Alleged a *Per Se* Violation.

The *per se* rule applies only to "practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). While group boycotts may be treated as *per se* violations where they reflect an "effort of competitors to barricade themselves from competition at their own level," *Topps Chewing Gum, Inc. v. Major League Baseball Players Ass'n*, 641 F. Supp. 1179, 1186 (S.D.N.Y. 1986) (citations and quotations omitted), Plaintiffs must "present a threshold case that the challenged activity falls into a category [of conduct] likely to have predominantly anticompetitive effects." *Bogan v. Hodgkins*, 166 F.3d 509, 515 (2d Cir. 1999) (quotation omitted). Plaintiffs have not plausibly alleged a group boycott of Bluesky that warrants *per se* treatment.

Most fundamentally, the Supreme Court has held alleged "restraints" in the context of sports leagues are often "essential if the product to is to be available at all" and "*per se* rules of illegality are inapplicable;" instead, such conduct "must be judged according to the flexible rule of reason." *Am. Needle*, 560 U.S. at 203 (quotations omitted). Courts have regularly assessed alleged restraints imposed by sports leagues under the rule of reason and rejected *per se* treatment. *See, e.g.*, *North American Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 41 (2d Cir. 2018) ("Regulation of league sports is a textbook example of when the rule of

reason applies."); *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1392 (9th Cir. 1984) ("[T]he unique structure of the NFL precludes application of the per se rule."); *Choh v. Brown Univ.,* 753 F. Supp. 3d 117, 127 (D. Conn. 2024)  (applying rule of reason). Plaintiffs offer no plausible explanation why this Court should depart from the Supreme Court's direction here.

In any event, Plaintiffs fail to plausibly allege any boycott of Bluesky.  While they make conclusory allegations that the NFL "announced that its members teams . . . could not open official team accounts" on Bluesky, AC ¶ 2, and "refused to 'approve' Bluesky as a platform," AC ¶ 59, they cite no announcement to that effect, nor do they allege Bluesky has in fact requested approval as a social media partner and been rejected.  Indeed, Plaintiffs' only non-conclusory allegation in support of their group boycott claim is their citation to the comments of Fred Kirsch, VP of the New England Patriots, on a podcast.  But Mr. Kirsch clearly stated that Bluesky was not an NFL-approved social media platform **"*yet*"** and "'[w]henever the league gives us the green light we'll get back on Bluesky.'"  Ex. 7.  Mr. Kirsh did not say the NFL has "refused" to approve Bluesky or elected to "boycott" Bluesky.  To the contrary, Mr. Kirsch's comments suggest openness to Bluesky and the possibility that the NFL and its teams may engage with Bluesky after it has been vetted and approved as a social media partner, just as the NFL has done with the many other social media platforms the NFL has approved.  At most, Plaintiffs allege the NFL has not yet approved a nascent platform; they do not plausibly allege a group boycott of Bluesky, much less one in favor of X.[16]

Even if Plaintiffs had plausibly alleged a group boycott of Bluesky, they fail to allege sufficient facts to warrant *per se* treatment. The NFL's alleged conduct does not cause *any*

---

[16]    Plaintiffs initially alleged a boycott of Bluesky in favor of an "exclusive" social media partnership with X, Dkt. No. 1 at ¶¶ 48–50; this is clearly false, given the NFL's many other social partners.

competitive harm and has important pro-competitive justifications—including promotion of the NFL brand and protection of NFL-owned intellectual property—and thus is a far cry from the type of anticompetitive conduct that is "so likely to restrict competition without any offsetting efficiency gains that they should be condemned as [a] per se violations of § 1 of the Sherman Act." *N.W. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 290, 294 (1985); *see also infra* at 18. Finally, Plaintiffs fail to plausibly allege any incentive the NFL and its teams would have to boycott Bluesky specifically; the far more plausible inference is that the NFL and its teams have legitimate concerns regarding the NFL brand and distribution of official NFL content and therefore have established a policy for approving the platforms on which such content is distributed. *See, e.g.*, *Bilinski v. Keith Haring Found., Inc.*, 96 F. Supp. 3d 35, 44 (S.D.N.Y.), *aff'd in part*, 632 F. App'x 637 (2d Cir. 2015) (dismissing complaint for failure to allege "what benefit the [defendants] derive from participating in a group boycott"). Plaintiffs' claims must be analyzed under the rule of reason.

**B.    Plaintiffs Have Not Plausibly Alleged a Violation Under the Rule of Reason.**

Courts apply a three-step burden-shifting analysis to assess whether conduct is an "unreasonable" restraint of trade under the rule of reason. Plaintiffs must first show the challenged conduct had "an actual adverse effect on competition as a whole" in a properly defined "relevant market." *United States v. Am. Express Co.*, 838 F.3d 179, 194 (2d Cir. 2016) (quotation omitted). If so, the burden shifts to Defendants to demonstrate "procompetitive effects" of the challenged conduct. *Id.* at 195. Plaintiffs must then show any pro-competitive benefits could be achieved through less restrictive means. *Id.* As the Supreme Court has recognized in cases involving the NFL, the rule of reason "may not require a detailed analysis; it can sometimes be applied in the twinkling of an eye." *Am. Needle*, 560 U.S. at 203 (quotation omitted). Given Plaintiffs' abject failure to plausibly define a relevant product market or allege

harm to competition, and the pro-competitive reasons for the NFL's alleged conduct, Plaintiffs do not plausibly allege an "unreasonable" restraint of trade.

### 1. Plaintiffs Have Not Plausibly Alleged a Relevant Antitrust Market.

"[A]n antitrust complaint must explain why the market it alleges is the relevant, economically significant product market." *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 347 (S.D.N.Y. 2021) (quotations omitted). "[A]n alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (quotations omitted). Accordingly, a proposed market is "legally insufficient" and a motion to dismiss should be granted "where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability . . . or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products." *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 237 (2d Cir. 2008) (quotation omitted).

Plaintiffs' alleged product market limited to "NFL News in microblog format" is far too narrow and does not include obvious substitute sources of NFL news to which consumers can and do turn their attention. AC ¶ 24. Although Plaintiffs allege in conclusory fashion that news and other content posted on official team accounts on X is distinct from NFL content available elsewhere (official or unofficial), these allegations are implausible in light of publicly-available information demonstrating that injury updates, roster moves, in-game scoring highlights, and other breaking news are available across a wide variety of other social media, online and traditional media platforms from official NFL and team accounts, sports news organizations, and fan accounts. *Supra* at 4–7. The allegation that content posted by NFL teams on X may not be exactly the same as that posted elsewhere does not mean that no other source of NFL news and

engagement is a reasonable substitute for official NFL team posts on X. "[R]easonable interchangeability of use" merely requires that one product is "roughly equivalent to another for the use to which it is put." *Chapman*, 546 F.3d at 238 (citations omitted). For fans seeking NFL news and engagement, these alternative NFL news sources provide "roughly equivalent" content at a minimum. Indeed, Plaintiffs' own initial complaint alleged the relevant product market was "NFL news" generally—not simply on "microblogs"—in recognition of this obvious conclusion. Complaint ¶ 23 (Dkt. No. 1) ("The relevant product market is the market for NFL news.").

Plaintiffs' allegation that the "microblog" format of X, Threads, and Bluesky is so distinct that NFL news available on any other platform or medium is not a reasonable substitute for NFL fans' attention is likewise implausible. Social media industry participants recognize so-called "microblogs" compete for user "attention" with a variety of social media platforms and other mediums. For example, Twitter stated in its 2022 Form 10-K that it "compete[s] . . . for people's attention" with "a variety of social networking platforms" including Facebook, Instagram, YouTube, LinkedIn, Snapchat, TikTok, and Pinterest, in addition to "other digital distributors and traditional television providers."[17] Reddit similarly states that it "compet[es] for people's time" with Facebook, Instagram, Threads, YouTube, Snap, X, TikTok, and Pinterest, among others, as well as "other news sites."[18] Snap Inc. likewise identifies its competition as including TikTok, Facebook, Instagram, Threads, Pinterest, and X specifically, as well as other "digital platforms" and "traditional companies in print, radio, and television."[19] As described

---

[17] Ex. 15 (Twitter Inc., 2022 Form 10-K) at 8, 15. The Court may take judicial notice of the fact that these platforms—each referenced in the AC—stated as much in their SEC filings in assessing whether Plaintiffs' market definition is plausible. *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 434 (S.D.N.Y. 2018) (noting court may consider SEC filings on motion to dismiss).

[18] Ex. 16 (Reddit Inc., 2025 Form 10-K) at 11.

[19] Ex. 17 (Snap Inc., 2025 Form 10-K) at 10.

above, NFL news and content—from official team accounts and otherwise—is widely available to NFL fans on *all* these platforms and mediums. *Supra* at 4–7.

In short, fans can access NFL news on a wide variety of social media platforms, websites, and other media and are not limited to only official team accounts on X or other "microblogs." Plaintiffs' "failed attempts to limit [the] product market" to NFL news on so-called "microblogs" without any "plausible explanation as to why [the] market should be limited" in that way makes "dismissal on the pleadings . . . appropriate." *Todd*, 275 F.3d at 200; *see Choh*, 753 F. Supp. 3d at 132 (market implausible where universities were "not the only schools to which . . . students sell their athletic service"); *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 483 (S.D.N.Y. 2016) (Engelmayer, J.) (rejecting "implausible" alleged market); *In re Inclusive Access Course Materials Antitrust Litig.*, 544 F. Supp. 3d 420, 439 (S.D.N.Y. 2021) (market implausible where it did not "include every product that consumers treat as an acceptable substitute").

### 2.    Plaintiffs Have Not Plausibly Alleged Harm to Competition.

Plaintiffs make no effort to allege harm to competition in a properly defined market for NFL news that includes the wide variety of platforms and media through which such content is available. Even crediting Plaintiffs' utterly implausible and legally insufficient "microblog" product market, Plaintiffs still have not met their burden to plausibly allege harm to competition by showing "increased prices, reduced quality, or reduced outputs" in that market. *Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 362 (S.D.N.Y. 2018).

Plaintiffs admit that they do not pay money for the services offered by X, Threads, or any other social media platform and are not forced to pay a higher price to access NFL news. *See* AC at ¶ 58 ("Plaintiffs, as fans, would pay in their attention").[20]  Accordingly, Plaintiffs do not

---

[20]    To the extent Plaintiffs claim to "pay" for NFL news with "attention," Plaintiffs do not explain how the amount of "attention" they pay for NFL news would increase due to the NFL's alleged conduct.

plausibly allege that the NFL's policy has any price impact whatsoever. *Planetarium Travel, Inc. v. Altour Int'l, Inc.*, 97 F. Supp. 3d 424, 432 (S.D.N.Y.), *aff'd*, 622 F. App'x 40 (2d Cir. 2015) (dismissing Sherman Act claim where defendant had no ability "raise prices").

Insofar as Plaintiffs allege that the NFL's alleged boycott of Bluesky reduces the quality or output of "NFL news in microblog form," their allegations also fail. Plaintiffs cannot dispute Bluesky hosts fan and other accounts that distribute and discuss NFL news (even if not official NFL and team accounts at this time) or that there is extensive NFL news discussion—including on official NFL and team accounts—on Threads. And Plaintiffs admit they—and any other NFL news consumer—can access "up-to-the minute granular information posts from official team accounts" *for free*, on X. Plaintiffs' only contention is that they must use X to access such information, which they would prefer not to do. AC ¶ 8 ("[Plaintiffs] do not want to have to follow their teams on Elon Musk's X platform."). Indeed, Plaintiffs appear to have no issue with the quality or output of the NFL news on X, they simply want to view the same content elsewhere. While Plaintiffs are free to boycott the X platform, antitrust law is concerned with competition—it does not provide a remedy for consumers who disagree with a business' politics. *See Assoc. Gen. Contractors*, 459 U.S. at 538 ("Sherman Act was enacted to assure customers the benefits of price competition"). A plaintiff cannot plausibly allege harm to competition in a market by simply ignoring the output of the largest participant in their defined market.

In short, NFL news is ubiquitous, and Plaintiffs have not plausibly alleged any harm to competition in a properly defined market for NFL news as a result of the NFL's conduct.

### 3.    The NFL's Policy is Pro-Competitive and Promotes Broad Distribution of Content to NFL Fans.

The NFL's policy of approving social media platforms is also pro-competitive and benefits NFL fans by promoting distribution of official NFL content.

Content posted on social media by NFL member teams implicates the NFL's intellectual property rights, including "game video footage" in the form of highlights, *Washington*, 880 F. Supp. 2d at 1006, and "photographs displaying both the NFL shield and NFL Club marks on a player's jersey and/or helmet . . . in NFL game-action settings or at NFL events." *Spinelli*, 96 F. Supp. 3d at 114. The "NFL and NFL Clubs must cooperate to produce and sell [this content]; no one entity can do it alone." *Id.* at 118. As such, the NFL has a legal interest in protecting this content and licensing it on terms beneficial to the league as a whole. It is perfectly appropriate for the NFL to review social media platforms to ensure they have procedures to protect NFL intellectual property and to reach terms on which NFL content can be appropriately licensed. *See, e.g.*, *1-800 Contacts, Inc. v. Fed. Trade Comm'n*, 1 F.4th 102, 119 (2d Cir. 2021) (finding trademark protection to be a valid pro-competitive justification); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 420 F. Supp. 2d 212, 219 (S.D.N.Y. 2005), aff'd, 542 F.3d 290 (2d Cir. 2008) (finding no Sherman Act violation where conduct "facilitates the efficient protection and quality control of MLB intellectual property").

In addition, the NFL has a recognized interest in protecting its brand and reputation. *American Needle*, 560 U.S. at 202. Social media platforms can be used as tools to spread misinformation, hate speech, and other content that could be damaging to the NFL's brand. *See Murthy*, 603 U.S. at 51–53 (noting content moderation policies of large online platforms). In addition, given social media platforms "monetize" attention through advertising, AC ¶ 25, the NFL (absent an approval policy that prohibits it) could be tied to advertisers damaging to the NFL's brand, such as firearms, pornography, and other controversial products. *Id.* ¶ 28. The NFL thus has a legitimate interest in ensuring social media platforms have processes in place to protect against detrimental content or products that the NFL does not want to be associated with.

Absent safeguards to protect the NFL's brand and licenses for its intellectual property, the NFL and its teams would be limited in the content they could post and might choose not to maintain official accounts on social media platforms at all. The NFL's approval of social media platforms thus enables official NFL content to be broadly available. In short, Plaintiffs have not plausibly alleged that the NFL's policies are an *unreasonable* restraint on trade; to the contrary, they increase the availability of official NFL content and are pro-competitive. *See, e.g.*, *North American Soccer League*, 296 F. Supp. 3d. at 473–474 (finding soccer federation application of league standards was pro-competitive); *Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 955 (N.D. Ill. 2019) (dismissing Section 1 claim and concluding hockey association rule was a "reasonable" restraint that fostered competition).

## IV.    THE AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE.

Leave to amend should be denied if amendment would be "futil[e]" or where there has been "failure to cure deficiencies by amendments." *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016) (citation omitted). Plaintiffs have already amended once in response to Defendant's challenges, Stipulation (Dkt. No. 27), but "still fail[] to state a cognizable claim." *Ng v. Sedgwick Glob. Inc.*, No. 1:23-CV-10380 (MKV), 2025 WL 579972, at *6 (S.D.N.Y. Feb. 21, 2025). Moreover, the fundamental deficiencies in Plaintiffs' claims make clear that any further amendment would be futile. *See, e.g.*, *Chalmers v. NCAA*, 24-Civ-5008 (PAE), 2025 WL 1225168, at *17 (S.D.N.Y. Apr. 28, 2025) (Engelmayer, J.) (denying leave to amend in antitrust case).

## <u>CONCLUSION</u>

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice.

Dated: New York, New York                     Respectfully submitted,
       May 13, 2025

DEBEVOISE & PLIMPTON LLP

By: ____/s/ Michael Schaper_____

Michael Schaper (*mschaper@debevoise.com*)
John Gleeson (*jgleeson@debevoise.com*)
J. Robert Abraham (*jrabraham@debevoise.com*)
66 Hudson Boulevard
New York, New York 10001
Tel: (212) 909-6000

Edward D. Hassi (*thassi@debevoise.com*)
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 383-8000

*Attorneys for Defendants the National Football League and NFL Enterprises, LLC*

## CERTIFICATE OF COMPLIANCE

I, Michael Schaper, hereby certify that the foregoing memorandum complies with the word limits set forth in Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.  According to the word count of the word-processing program used to prepare the memorandum, and exclusive of the portions of it that are excluded by Local Rule 7.1(c), this memorandum contains 8,623 words.

/s/ Michael Schaper
Michael Schaper