UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PATRICK BROWN *and* COLLIN VINCENT,

Plaintiffs,

-v-

NATIONAL FOOTBALL LEAGUE, INC. *and*
NFL ENTERPRISES LLC,

Defendants.

25 Civ. 1220 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This case involves an antitrust claim brought by fans of professional football.

Plaintiffs Patrick Brown and Collin Vincent bring a single antitrust claim under the

Sherman Act, 15 U.S.C. § 1, against the National Football League[1] and NFL Enterprises LLC

(collectively, the "NFL").  Brown and Vincent are fans of NFL teams who follow football news

on social media platforms.  They allege that, although the NFL permits its teams to post football-

related updates through official team accounts on "X"—the microblogging platform today

operated by X Corp. and formerly known as Twitter—the NFL has barred these teams from

opening accounts and posting updates on Bluesky Social PBC ("Bluesky"), an X competitor.

Brown and Vincent prefer to read these updates on Bluesky.  They claim here that the NFL's

policy is an unreasonable restraint on trade that violates § 1.  They seek injunctive relief.

The NFL moves to dismiss the amended complaint (the "AC") on multiple grounds.  It

argues, under Federal Rule of Civil Procedure 12(b)(1), that Brown and Vincent lack Article III

---

[1] The amended complaint incorrectly terms this defendant "National Football League, Inc."  *See*
Dkt. 29 (motion to dismiss) at 8.

standing; and under Rule 12(b)(6), that the AC does not state a claim, because it does not plausibly allege a *per se* or rule-of-reason violation of § 1 and because Brown and Vincent lack antitrust standing.

For the following reasons, the Court grants the motion to dismiss under Rule 12(b)(1), on the ground that Brown and Vincent lack Article III standing.

## I.      Factual Background[2]

### A.      The Parties

Brown and Vincent live in Illinois and California, respectively.  Dkt. 25 ("AC") ¶¶ 16–17.  Each has a Bluesky account.  Each states that, if NFL teams posted on Bluesky, he would follow teams—such as the Chicago Bears and the Seattle Seahawks—on that platform.  *Id.*

The National Football League is a corporation headquartered in this District.  *See id.* ¶ 18.  It is owned by the 32 member teams.  *Id.*  Each team is separately owned and operated.  *Id.* As alleged, each team competes, both on the playing field and economically, with the others.  *Id.* ¶ 46.

NFL Enterprises LLC is a limited liability company organized in Delaware and headquartered in this District.  *Id.* ¶ 19.  It was organized to hold and license the broadcast rights of the 32 NFL teams.  *Id.*

---

[2] The facts in this section are all drawn from the Amended Complaint.  Dkt. 25 ("AC").  In resolving a Rule 12(b)(1) motion, the Court may consider evidence outside the pleadings, such as affidavits and exhibits.  *See Cangemi v. United States*, 13 F.4th 115, 129 (2d Cir. 2021) (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  Although the NFL asks the Court to take judicial notice of certain exhibits filed in connection with its motion, *see* Dkts. 30–31, the Court denies this request as moot because the AC, on its face, does not plausibly allege facts supporting Article III standing.

**B.      The NFL's Content Partnership with X**

Since 2013, the NFL and X (formerly Twitter, Inc.) have had a "content partnership." *Id.*
¶ 32.  It allows X to publish real-time highlights from football games, such as touchdowns.  *Id.*
¶ 33.  During the offseason, reporters post on X with news about team practices and other NFL-
related topics, and fans on X discuss teams' acquisitions of free agents and other roster changes.
*Id.* ¶ 34.  For example, during the NFL draft (the high-profile annual event in which teams select
eligible players to join their rosters), X published more than one million posts concerning the
NFL; these appeared on users' screens more than 800 million times.  *Id.*  The NFL has
repeatedly renewed its partnership with X.  *Id.* ¶ 35.  Fans do not pay money to receive NFL
news on X.  *See id.* ¶ 25.

**C.      The NFL's Instruction that Individual Teams Not Operate on Bluesky**

Bluesky is a microblogging platform that was founded to move "online discourse beyond
the control of social media oligarchs."  *Id.* ¶ 3.  It has grown rapidly and now has more than 28
million users.  *Id.* ¶ 36.  Many, according to Brown and Vincent, are "Twitter refugees" who left
Twitter (*i.e.*, X) due to "rapid changes to rules and culture under the ownership of Elon Musk."
*Id.* ¶¶ 3–4.

Initially, multiple NFL teams, including the New England Patriots, had accounts on
Bluesky to communicate with fans.  *Id.* ¶¶ 37–38.  Bluesky "closely matches the functionality of
X," allowing teams to "use it in exactly the same way they use X."  *Id.* ¶ 39.  Thus, teams could
immediately post pre-game and in-game highlights on Bluesky.  *Id.*  Like X, Bluesky does not
charge fans money to open accounts or view posts regarding the NFL.  *See id.* ¶ 25.

As alleged, however, the NFL later instructed its member teams to delete their Bluesky accounts.[3]  *Id.* ¶ 38.  But for this instruction, at least some NFL teams would use Bluesky.  *Id.* ¶¶ 38, 51.  The Patriots' vice president of content, Fred Kirsch, for example, has stated: "Whenever the league gives us the green light[,] we'll get back on Bluesky."  *Id.* ¶ 38.

The NFL has also not yet approved Threads, another X competitor, as a platform for teams to post updates.  *Id.* ¶ 47.  Individual NFL teams have accounts on other social media platforms, such as Facebook, Instagram, and TikTok, but they tend not to use these to post the real-time updates they post on X, such as injury reports, trade information, in-game scoring, and player status decisions.  *Id.* ¶¶ 50, 53–54.

As a result of the NFL's alleged ban on its teams' use of Bluesky, the AC states, Brown and Vincent must choose between receiving the real-time updates uniquely available on X and foregoing such content.  *Id.* ¶¶ 51–52.  The AC alleges that this content is important to fans who participate in fantasy football leagues—in which participants select rosters of actual professional football players and compete against others, sometimes for monetary prizes, based on the players' on-field performance.  *See id.* ¶¶ 56–57.[4]  The AC does not otherwise allege a monetary consequence to fans from the NFL's ban on Bluesky.  *See id.* ¶ 25 (fans "do not pay money for

---

[3] The AC does not allege when individual teams used (or stopped using) Bluesky, or when the NFL instructed them to stop doing so.

[4] The AC implies, but does not squarely allege, that Brown and Vincent themselves play fantasy football in leagues where money is at stake.  *See* AC ¶¶ 56–57 (NFL teams' posts on X contain "exactly the type of information relied upon in making decisions in fantasy football or other games of skill," and "[s]ince many [fantasy football] leagues are monetized, Plaintiffs are injured . . . if they choose not to engage with X").  It does not allege that Brown and Vincent have lost money in such leagues as a result of lack of access to real-time content uniquely accessible on X.  Nor does it allege that the rules of these leagues would enable a participant to revise his or her weekly fantasy lineup based on such information.

their team's news" on X (or Bluesky), but instead "pay in attention, which social media platforms . . . in turn monetize by advertising and by selling data").

## II.    Procedural History

On February 11, 2025, Brown and Vincent filed their initial Complaint.  Dkt. 1.  On April 11, 2025, exercising their one-time right to amend as a matter of course under Rule 15(a)(1), they filed the AC.  Dkt. 25; *see also* Dkt. 27 at 2; Dkt. 32 at 1.

On May 13, 2025, the NFL filed a motion to dismiss, Dkt. 28, and a supporting memorandum of law, Dkt. 29.  It also filed a request for judicial notice of certain exhibits, Dkt. 30, and a declaration attaching these exhibits, Dkt. 31.  On June 12, 2025, Brown and Vincent opposed the NFL's motion to dismiss, Dkt. 35, and its request for judicial notice, Dkt. 36.  On July 3, 2025, the NFL replied in support of its motion to dismiss, Dkt. 37, and its request for judicial notice, Dkt. 38.

## III.    Legal Standards Governing Motions to Dismiss Under Rule 12(b)(1)

A court must dismiss a claim for lack of subject matter jurisdiction under Rule 12(b)(1) when it "lacks the statutory or constitutional power to adjudicate it, such as when . . . the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (citation omitted).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that [jurisdiction] exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  In resolving a motion to dismiss for lack of subject matter jurisdiction, "the court must take all facts alleged in the complaint as true," *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) (citation omitted), but "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it," *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998); *see also*

*APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003); *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011).  On such a motion, a court may consider evidence outside the pleadings, such as affidavits and exhibits.  *See Makarova*, 201 F.3d at 113.

IV.    **Discussion**

The NFL moves to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, arguing that Brown and Vincent lack Article III standing.  For the reasons below, the Court grants this motion, finding that the AC does not plausibly plead that Brown and Vincent suffered a cognizable injury in fact.  The Court accordingly does not reach the NFL's separate motion to dismiss, under Rule 12(b)(6), for failure to state a claim.[5]  *See Ross v. Bank of Am., N.A.*, 524 F.3d 217, 222 n.1 (2d Cir. 2008).

A.    **Legal Standards Governing the Injury-in-Fact Requirement**

Article III of the Constitution limits the federal judicial power to the resolution of "cases" and "controversies."  U.S. Const. art. III., § 2.  An "essential and unchanging part" of this limitation is that a plaintiff have standing to sue.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  Article III standing thus "is the threshold question in every federal case, determining the power of the court to entertain the suit."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

A plaintiff must "demonstrate standing for each claim and form of relief sought."  *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Baur v. Veneman*, 352 F.3d 625, 642 n.15 (2d Cir. 2003)).  The "irreducible constitutional minimum" of standing is that a plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of

---

[5] In that motion, the NFL argues that the AC does not plausibly allege a *per se* or rule-of-reason violation of the Sherman Act, and that plaintiffs lack antitrust standing.  *See, e.g.*, *Gatt Commc'ns, Inc. v. PMC Assocs.*, 711 F.3d 68, 76 (2d Cir. 2013) (antitrust standing requires that plaintiff have suffered an injury "of the type that the antitrust statute was intended to forestall" and be an "efficient enforcer" of such statute (citation omitted)).

the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan*, 504 U.S. at 560–61).  To satisfy the injury-in-fact requirement, a plaintiff seeking injunctive relief cannot rely on past injury alone. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).  Instead, he must establish a "real or immediate threat of injury"—*i.e.*, that he "is likely to be harmed again in the future in a similar way." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (citation omitted).  The "threatened injury must be *certainly impending* to constitute injury in fact, and allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphases in original) (cleaned up).

Article III requires that a plaintiff's injury be "concrete"—*i.e.*, "real and not abstract." *Spokeo*, 578 U.S. at 340 (citation omitted).  This requirement "ensures that federal courts decide only 'the rights of individuals' . . . [and] exercise 'their proper function in a limited and separated government.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (first quoting *Marbury v. Madison*, 1 Cranch 137, 170 (1803), then quoting John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219, 1224 (1993)).

Certain harms "readily qualify as concrete." *TransUnion*, 594 U.S. at 424.  "The most obvious" of these "are traditional tangible harms, such as physical harms and monetary harms." *Id.* at 425.  Financial loss is a "classic pocketbook injury sufficient to give [plaintiff] standing." *Tyler v. Hennepin Cnty., Minnesota*, 598 U.S. 631, 636 (2023) (citing *TransUnion*, 594 U.S. at 425); *see also Moreira v. Societe Generale, S.A.*, 125 F.4th 371, 385 (2d Cir. 2025) (same).

Intangible harms can also be concrete. *TransUnion*, 594 U.S. at 425.  The Constitution defines certain intangible injuries, such as the abridgment of free speech and infringement of free exercise of religion. *See, e.g.*, *Spokeo*, 578 U.S. at 340 (citing *Pleasant Grove City v. Summum*,

555 U.S. 460 (2009) (free speech), and *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) (free exercise of religion)). Concrete intangible harms also include those "with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," such as reputational harm, disclosure of private information, and intrusion upon seclusion. *TransUnion*, 594 U.S. at 425. In assessing such historical comparisons, courts "do not require an exact duplicate." *Id.* at 433. Instead, the asserted harm must bear "a sufficiently close relationship" to one traditionally recognized as a basis for lawsuits in American courts. *Id.* (holding publication to third party of misleading credit reports concerning plaintiffs bore "sufficiently close" relationship to reputational harm associated with defamation actions).

Congress may "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Spokeo*, 578 U.S. at 341 (citation omitted). And Congress's expectations can be "instructive" on whether a harm is sufficiently concrete to qualify as an injury in fact. *Id.* But a statutory violation does not necessarily confer Article III standing, which "requires a concrete injury even in the context of a statutory violation." *Id.*; *see also TransUnion*, 594 U.S. at 425–26. Put simply: "No concrete harm, no standing." *TransUnion*, 594 U.S. at 442.

### B.     Brown and Vincent's Asserted Injury

The AC's theory of injury involves the real-time NFL information available on X. It alleges that X is a "separate product market from other methods of getting online content, such as Facebook, Instagram, TikTok, or news apps." AC ¶ 25. It alleges that the information that NFL teams "microblog" on X is qualitatively different from the information available through other platforms. *See, e.g.*, *id.* It alleges that, although other platforms post content that is "days or weeks old," NFL teams' posts on X contain "granular and time-sensitive" information, such as

8

in-game highlight videos or news reports of injuries, offseason trades, or other acquisitions. *Id.* ¶¶ 25, 45, 47. It alleges that, because the NFL bars teams from cross-posting this content on Bluesky, Brown and Vincent, to receive this real-time content, must either (1) use X—an outlet with which they prefer not to associate—or (2) forgo this information, because it is otherwise unavailable in real time. *Id.* ¶ 49.

The Court assumes the truth of the AC's factual allegations, which the NFL, for the purpose of the motion, does not contest. But to analyze whether plaintiffs have standing, it is essential to isolate precisely the injury that the AC alleges—and what it does not allege.

The AC does *not* allege that the NFL has barred Brown and Vincent from obtaining the real-time information they seek. On the contrary, it alleges that this information is available to them—on X. *See, e.g., id.* ¶ 55 (through X, fans "receive granular, up-to-the-minute, team-generated content both during the practice weeks (regarding player status and team activities) and during games (regarding [] player status, scoring, and outcomes of games)"). The AC further acknowledges that this information is available to them on X *for free*. *See id.* ¶ 25 ("fans do not pay money for their team's news"). It also alleges that, were the NFL to lift its ban on team postings on Bluesky, no additional information would be available to Brown and Vincent beyond that presently available to them on X. *See, e.g., id.* ¶¶ 39 ("teams could and would use [Bluesky] *in exactly the same way they use X*[:] to disseminate NFL news on microblogging platforms, particularly of the time-sensitive sort comprising pre-game and in-game highlights" (emphasis added)), 50 (alleging injury based on teams not "cross-posting" content they post on X to other platforms), 54–55 (same). The AC does not allege that plaintiffs have any freestanding legal entitlement to receive this information, in real time or otherwise—let alone on any

9

particular platform, channel, or medium.  To the contrary, it acknowledges that this information is disseminated at the discretion of privately owned and operated NFL teams.  *See id.* ¶¶ 18, 50.

The injury that plaintiffs claim from the § 1 conspiracy the AC alleges thus reduces to this: plaintiffs have been denied the ability to obtain real-time NFL team information on a private platform with which they are ideologically comfortable.  *See id.* ¶¶ 3–4 ("Bluesky's users are Twitter refugees" who disagree with Elon Musk's "controversial management of what is now X"), 9 (Brown and Vincent "do not want to have to follow their teams on Elon Musk's X platform").

But that injury—whether measured under the case law applicable to tangible or intangible injuries—is not concrete, and thus does not qualify as a cognizable injury in fact.

*Tangible injuries*:  The AC does not plausibly allege that Brown or Vincent suffered a monetary loss by virtue of the absence of team-posted information on Bluesky.  It does not allege that they paid more money to access the information at issue.  On the contrary, it admits that X, like Bluesky, is free.  *See* AC ¶ 25.  It does not allege that the NFL conditioned Brown or Vincent's access to X on the relinquishment of any right.  It does not allege any other form of "pocketbook injury."  *Tyler*, 598 U.S. at 636.

The AC vaguely implies that Brown and Vincent could potentially make money playing fantasy football, and that foregoing team-posted news on X could impair their prospects of doing so.  Such posts on X, it states, contain "the type of information relied upon in making decisions in fantasy football or other games of skill," and that because "many [fantasy football] leagues are monetized, Plaintiffs are injured . . . if they choose not to engage with X."  AC ¶¶ 56–57.  But, for multiple reasons, that allegation does not salvage plaintiffs' bid.  For one, in opposing the motion to dismiss, Brown and Vincent abandoned the claim that diminished odds of winning

10

fantasy football prizes are a cognizable injury. Opp'n at 20–22. For another, any such claim would be speculative, because the AC does not plead, other than conclusorily, that accessing NFL news on Bluesky would enable either plaintiff to win in fantasy football, let alone at a level carrying award money. *See, e.g.*, *Clapper*, 568 U.S. at 409–10 ("threatened injury must be *certainly impending* to constitute injury in fact" and "allegations of *possible* future injury are not sufficient" (emphases in original)); *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (rejecting standing theory based on speculative chain of possibilities); *McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 709–10 (9th Cir. 2020) (no injury in fact where plaintiff failed to plausibly allege that eating popcorn created substantial risk of future disease). For a third, Brown and Vincent do not allege inability to access the information they desire, but merely, as noted, an inability to access it on a platform with which they are ideologically comfortable.

In a separate attempt to claim economic injury, the AC deploys monetary idioms. It asserts that, were NFL teams allowed to post news on Bluesky, Brown and Vincent "would pay in their attention" to it. AC ¶ 58. Were they to do that, it alleges, NFL teams could "monetize" Brown and Vincent's engagement on that platform through "advertising and selling data." *Id*. These tortured formulations do not avail plaintiffs. Plaintiffs' "attention" is an intangible that cannot be likened to money. And, to the extent the AC implies that NFL teams are missing out on greater profits available via Bluesky, that theory of economic harm is pled only conclusorily. And the teams are not plaintiffs here. To have standing, a plaintiff must plausibly allege harms "personal and individual" to himself. *Lujan*, 504 U.S. 555, 560 n.1 (1992); *see also Warth*, 422 U.S. at 499 (a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"). That requirement "assure[s] that concrete adverseness which sharpens the presentation of issues upon which the court so

11

largely depends for illumination of difficult questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962) (cleaned up).

The AC thus does not plausibly plead an injury in fact based on pecuniary or other tangible harm. *See, e.g.*, *Maddox v. Bank of N.Y. Mellon Tr. Co.*, 19 F.4th 58, 64–66 (2d Cir. 2021) (concrete harm not pled based on alleged statutory violation where complaint did not plead actual loss or a close analog to traditional basis for lawsuit); *Whalen v. Michaels Stores, Inc.*, 689 F. App'x 89, 90 (2d Cir. 2017) (same where plaintiff's credit card information was stolen but no fraudulent charges were made); *Harry v. Total Gas & Power N. Am., Inc.*, 244 F. Supp. 3d 402, 415 n.5 (S.D.N.Y. 2017) (same where plaintiffs did not allege that they had "paid more than they should have or were paid less than they should have been" (cleaned up)), *aff'd as modified*, 889 F.3d 104 (2d Cir. 2018).

*Intangible injuries*:  Certain intangible injuries can support Article III standing.  But the AC's claim that Brown and Vincent are harmed by their inability to receive real-time updates on Bluesky tracking those available on X falls short of so qualifying.

Again, critically, the AC does not allege that the updates posted on X are different in quality or quantity than those that—but for the alleged § 1 conspiracy—would be posted on Bluesky.  On the contrary, it portrays X as offering a bonanza of real-time updates and discussions about in-game developments, injury reports, player trades, off-season recruiting, and myriad other topics. *See, e.g.*, *id.* ¶¶ 34 (more than one million posts on X concerning the NFL draft alone), 55 (through X, fans "receive granular, up-to-the-minute, team-generated content both during the practice weeks (regarding player status and team activities) and during games (regarding [] player status, scoring, and outcomes of games)").  Plaintiffs' grievance is instead that they are unable to receive identical content on the social media platform they prefer. *See,*

12

*e.g.*, *id.* ¶¶ 39 ("teams could and would use [Bluesky] *in exactly the same way they use X*[:] to disseminate NFL news on microblogging platforms, particularly of the time-sensitive sort comprising pre-game and in-game highlights" (emphasis added)), 50 (alleging injury based on teams not "cross-posting" content they post on X to other platforms), 54–55 (same).

That asserted injury is not a viable basis for Article III standing. Brown and Vincent have not mustered any supportive case law. And they do not contend that the intangible injury they claim—an inability to obtain information on their preferred, privately owned platform—resembles any injury traditionally recognized as providing a basis for lawsuits in American courts. *See TransUnion*, 594 U.S. at 424–25; *Spokeo*, 578 U.S. at 341.

The injury alleged here is notably less concrete than the harm that *Murthy v. Missouri*, 603 U.S. 43 (2024) held inadequate. There, states and social media users sued executive branch officials and agencies, claiming they had violated the First Amendment by pressuring social media platforms to suppress protected speech regarding COVID-19. *Id.* at 48–50. The Supreme Court held that the plaintiffs had not shown that these injuries were traceable to the defendants' challenged conduct or redressable by the injunctive relief they sought. *Id.* at 49–50. Salient here, those plaintiffs advanced an injury-in-fact theory that the Court rejected. They argued that their First Amendment "right to listen"—their "interest in reading and engaging with the content of other speakers on social media"—had been abridged. *Id.* at 74–75. The Court rejected that theory of Article III injury as "startlingly broad" and vague, finding the pleaded injury neither concrete nor particularized. *Id.* It held that, although the First Amendment protects the right to "receive information and ideas," there is a "cognizable injury only where the listener has a concrete, specific connection to the speaker." *Id.* It noted that the plaintiffs had not identified any instance of content moderation that had caused them identifiable harm. *Id.*

13

Brown and Vincent's theory of injury in fact is even weaker.  Unlike the *Murthy* plaintiffs, they have not alleged an inability to receive any information.  They merely disdain the platform on which it is available.  And, unlike the cases *Murthy* cited, in which cognizable injuries to the right to receive information have been found,[6] this is not a First Amendment case.  It is an antitrust case among private parties, in which no First Amendment interests are claimed.

Plaintiffs' ideological discomfort with X does not implicate any legally protected interest.  On the contrary, under long-settled doctrine, Article III's injury-in-fact requirement—even in cases involving state action, which is not present here—"screens out plaintiffs" who, lacking concrete injury, "only have a general, legal, moral, ideological, or policy objection."  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024); *see also Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982) (no injury-in-fact where plaintiffs "fail[ed] to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees" (emphasis omitted)).

The Sherman Act, under which Brown and Vincent sue, also does not attempt to elevate the alleged intangible injury as legally protected.  Section 1 of the Act, at issue here, is aimed at conspiracies in restraint of trade or commerce.  Its focus is on collusive conduct with anti-competitive effects.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488–89 (1977).  The non-economic injury that Brown and Vincent claim—the absence of certain content

---

[6] As examples of such cases, the Supreme Court cited *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972), holding that professors had a First Amendment interest in challenging the visa denial of a person invited to speak at a conference, and *Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–757 (1976), holding that prescription drug customers had a First Amendment interest in challenging a state prohibition on the advertising price of such drugs.  *See Murthy*, 603 U.S. at 75.

on their preferred social media channel—is far afield from the harms to which § 1 is directed. And the bare claim that a defendant violated a law such as the Sherman Act does not give rise to an individual right "that permits all citizens . . . who suffer no distinctive concrete harm to sue." *TransUnion*, 594 U.S. at 429 (quoting *Lujan*, 504 U.S. at 576–577) (cleaned up); *see also Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300, 310–11 (2d Cir. 2024) (no injury in fact where plaintiff "failed to identify a concrete downstream harm he suffered as a result of the statutory violation").

Finally, *Ross v. Bank of America*, 524 F.3d 217 (2d Cir. 2008), the antitrust case on which Brown and Vincent principally rely, is far afield. The plaintiffs there alleged that banks had colluded to force credit card customers to accept mandatory arbitration clauses in cardholder agreements. *Id.* at 220–21. The Second Circuit held that the plaintiffs' claimed injuries— "reduced choice *and diminished quality in credit services*"—satisfied the injury-in-fact requirement. *Id.* at 223–24 (emphasis added). That was because the limited choice caused plaintiffs, in at least two respects, to receive "objectively less valuable cards than" otherwise. *Id.* at 224. First, because the cardholder agreements did not allow class actions, cardholders would need to "expend time and legal fees to monitor the legality of the banks' behavior," whereas they could have otherwise relied on "motivated class action attorneys to perform this function." *Id.* Second, a card that limits the holder to arbitration is less valuable than one that offers the holder a choice between court action and arbitration. *Id.* In contrast, here, Brown and Vincent do not claim any diminution in value of a product or service. They do not claim any difference between

the real-time NFL news accessible on X and that which would be available on Bluesky.

Plaintiffs' limited other case authorities are also easily distinguished.[7]

The AC therefore does not plead a cognizable Article III injury.[8]

---

[7] *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465 (S.D.N.Y. 2012), held that plaintiffs had alleged Article III standing where they claimed that, in purchasing video streaming packages, they had been harmed by a § 1 conspiracy that resulted not only in less choice, but also "reduced output, diminished product quality, . . . and suppressed price competition." *Id.* at 471, 480 n.76. The AC here does not claim any such § 1 injuries. *Shaw v. Dallas Cowboys Football Club, Ltd.*, 172 F.3d 299 (3d Cir. 1999) is also irrelevant. There, the Third Circuit construed the Sports Broadcasting Act without addressing Article III standing or its injury-in-fact requirement. *See id.* at 299–303.

[8] The NFL separately argues that standing is lacking because the AC does not plead an injury fairly traceable to the NFL's conduct. To meet Article III's traceability requirement, a plaintiff must "demonstrate a causal nexus between the defendant's conduct and the injury." *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016). A plaintiff need not prove such cause-and-effect "with absolute certainty"; "substantial likelihood of the alleged causality meets the test." *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 104 (2d Cir. 2018). It is "not necessarily fatal to standing" where a defendant's conduct is only an "indirect cause" of a plaintiff's injury. *Chevron Corp.*, 833 F.3d at 121 (citation omitted). But traceability is not established where an injury is "so completely due to the plaintiff's own fault as to break the causal chain." *St. Pierre v. Dyer*, 208 F.3d 394, 402 (2d Cir. 2000) (quoting 13 Charles A. Wright *et al.*, *Federal Practice and Procedure* § 3531.5 (2d ed. 1984)). In other words, it cannot be a "'self-inflicted' injury." *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013) (quoting *St. Pierre*, 208 F.3d at 403); *see also Backer ex rel. Freedman v. Shah*, 788 F.3d 341, 344 (2d Cir. 2015) (same); *Bandler v. Town of Woodstock*, 832 F. App'x 733, 734 (2d Cir. 2020) (summary order) (same).

Here, to the extent Brown and Vincent claim an inability to access NFL teams' real-time updates, that injury is not traceable to the NFL's conduct. It is proximately due to the fact that plaintiffs "prefer not to or refuse to" use that platform. AC ¶ 68. *See, e.g.*, *Bandler*, 832 F. App'x at 734–35 (no traceability where plaintiff's payment of filing fee was "self-inflicted"); *Taylor v. Fed. Deposit Ins. Co.*, 132 F.3d 753, 767 (D.C. Cir. 1997) (same where plaintiffs voluntarily left employment, making their alleged injuries "in large part self-inflicted"); *Union Cosm. Castle, Inc. v. Amorepacific Cosms. USA, Inc.*, 454 F. Supp. 2d 62, 70–71 (E.D.N.Y. 2006) (same where injuries resulted from plaintiffs' "poor business judgment" in rejecting defendants' offer of exclusive business arrangement); *Dean v. Town of Hempstead*, 527 F. Supp. 3d 347, 383–84, 405 (E.D.N.Y. 2021) (same where town delayed issuing permits to plaintiffs' establishment but plaintiffs themselves chose to close it).

C.      **Dismissal Without Leave to Amend**

In a single unelaborated-upon sentence, Brown and Vincent ask for leave to amend the AC in the event of dismissal.

District courts have "broad discretion" in determining whether to grant leave to amend. *Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000), *cert. denied*, 534 U.S. 826 (2001). Leave to amend "should generally be denied in instances of futility . . . [or] repeated failure to cure deficiencies by amendments previously allowed." *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016) (citation omitted).

Both of these circumstances are present. Amendment would be futile because the AC's deficiency results not from errant drafting, but from the nature of Brown and Vincent's injuries, which unavoidably are not concrete. And Brown and Vincent have already amended the operative complaint once in an attempt to overcome the NFL's arguments. In doing so, they agreed that such "shall be deemed their one amendment as a matter of course" under Rule 15(a)(1). Dkt. 27 at 1–2 (joint stipulation) (cleaned up).

The Court therefore denies Brown and Vincent's request for leave to amend the AC. *See, e.g.*, *Exelis*, 824 F.3d at 28–29 (affirming denial of leave to amend complaint a second time where plaintiff had been aware of challenges to his complaint and did not "describe a proposed new pleading to cure the deficiencies"); *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131–32 (2d Cir. 1993) (similar); *United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 319 F. Supp. 3d 747, 751 (S.D.N.Y. 2018) (collecting cases).

**CONCLUSION**

For the above reasons, the Court grants the NFL's motion to dismiss under Rule 12(b)(1) without leave to amend the AC. Because the dismissal is for lack of subject matter jurisdiction,

17

it is without prejudice to plaintiffs' ability to file a new action with a proper jurisdictional basis.

*See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 54–55 (2d Cir. 2016) ("where a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice, rather than with prejudice").

The Clerk of Court is respectfully directed to terminate all pending motions and to close this case.


SO ORDERED.


_____
PAUL A. ENGELMAYER
United States District Judge


Dated: February 3, 2026
       New York, New York

18